IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JEREMY JOHNSON,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER RE SENTENCING**<br><br>Case No. 2:11-501 CR DN PMW<br><br><br>District Judge David Nuffer |

This order contains some decisions made with regard to Mr. Johnson's sentencing set at

9:00 a.m. on Friday, July 29, 2016.

BACKGROUND FACTS ........................................................................................................ 1
OTHER BACKGROUND ................................................................................................... 10
 Convictions ................................................................................................................... 10
 Offense Level in Presentence Report ........................................................................... 10
 Criminal History. .......................................................................................................... 11
 Base Offense Level. ...................................................................................................... 11
DECISIONS ON DISPUTED ISSUES ................................................................................. 11
 Right to Jury Trial; Due Process .................................................................................. 11
 Sophisticated Means. .................................................................................................... 12
 Leader or Organizer. ..................................................................................................... 13
 Gross Receipts from financial institution in excess of $1,000,000 .............................. 15
 Obstruction of Justice ................................................................................................... 18
 Johnson Will Not Be Rewarded for Assistance ........................................................... 20
CONCLUSION ..................................................................................................................... 21

## BACKGROUND FACTS[1]

 iWorks was started by Jeremy Johnson in St. George Utah, and grew rapidly over the first

decade of this millennium. Its business involved marketing (subject of a federal court action in

---

[1] These facts and others in this order are found by a preponderance of the evidence from the trial record. This order also finds true the facts from the Presentence Investigation Report by the same standard.

the District of Nevada[2]) and always involved processing credit card payments for products sold on the internet. A merchant like iWorks must have a "merchant account" to process credit card sales. A buyer who uses a credit card for payment may, if dissatisfied with the merchant's refund or return process, "chargeback" their sales transaction, reversing their payment to the selling merchant. If chargebacks exceed 100 per month or if 1% of sales result in chargebacks, fines begin to accrue. These fines are assessed against the merchant acquiring bank and passed on to the merchant, usually collected from security reserves the bank system holds back from merchant payments. In 2008 and 2009 the level of chargebacks (and associated fees charged to iWorks by the credit card processing system) became financially significant. The financial levies were unparalleled in the credit card industry. In the period July 2008 to August 2009 over three million dollars in fees was levied on iWorks merchant accounts.[3]

| TOTAL MERCHANT ACCOUNT FEES JULY 2008 – AUGUST 2009 | |
|---|---|
| Wells Fargo Merchant Account Fees | $1,368,703.43 |
| Harris Bank Merchant Account Fees | $1,390,002.44 |
| HSBC Merchant Account Fees | $201,891.13 |
| Israel Credit Card Merchant Account Fees | $38,832.70 |
| Synovus Bank Merchant Account Fees | $6,227.49 |
| TOTAL | $3,005,657.19 |

These fines reduced iWorks income, but not in a significant way. Mr. Riddle testified that at its height in March of 2009, iWorks took in $34 million in one month.[4] And that iWorks' revenue in 2008 was $165 million to $168 million.[5]

---

[2] Case no. 2:10-CV-2203-MMD-GWF (D. Nev.).

[3] Exhibit 927.

[4] Trial Tr. vol. XXVI, 5778:7-13, docket no. 1522, filed June 6, 2016.

[5] Id. at 5783:22 – 5784:8.

In late 2008, an iWorks merchant account was placed on the Member Alert to Control High Risk (MATCH) list.[6] This list alerts banks participating in the credit card payment network (and their representatives) that a merchant has serious problems. Usually, it means a merchant cannot acquire a new credit card processing account. Placement on the MATCH list usually occurs after three months of fines, if a merchant fails to remediate chargebacks after repeated notices. As early as February 2009, iWorks was laying plans for establishing many merchant accounts.[7]

In April 2009, managing chargebacks on merchant accounts was a major priority. An April 14, 2009 email from Loyd Johnston to Jeremy Johnson, Ryan Riddle and others describes the efforts needed to manage accounts.[8] At that time the strategy was to terminate processing on accounts with chargeback trouble and move processing to other accounts.[9]

> Pivotal has raised some concerns over the last couple of weeks regarding the number of Life Style Fitness chargebacks. I have asked them "if we need to close the account down based on the number of chargebacks, will there be any repercussions"; they have stated quite pragmatically that if we both decide that it is in the best interests of the account to shut it down, there will be no problem to just "shut it down". We would then move the processing to one of the other accounts.
> Swipe is currently processing several programs that are in various stages of chargeback concerns. We have repeatedly asked about the concerns in being over the thresholds . . . .
>
> Swipe Discover Card for SelfHelpFF has been cancelled due to high chargebacks and the iWorks American Express account (the big one …644) will not add any additional programs to that existing account. They stated that there are already too many programs running through that account. We have an old iWorks Amex

---

[6] The MATCH list maintained by MasterCard is similar to and often referred to interchangeably with the Terminated Merchant File (TMF) maintained by Visa.

[7] Exhibit 693.

[8] Exhibit 700.

[9] The strategy of moving accounts was conceived sometime before late March 2009. In a March 25, 2009, email Johnson told Johnston "I always want accounts with different banks so if one gets shut down we have someplace else to put the volume imediatly [sic] without having to get new descriptors set up etc."

account that has been inactive for several months that we will use going forward on any programs that are set up at Swipe and/or RDK

Any new programs that are set up at Swipe are being processed through "JET Processing" in an effort to move away from the iWorks name.

RDK, which we typically refer to as HSBC (the acquiring bank) has been processing for about 2 months now. They appeared to be a little more bullet proof than the others and were willing to take more risk.

As of yesterday at 1:00 (MDT) we terminated the Natures Acai account because of high chargebacks and the potential for fines that can be mitigated for May by closing the account now. This will more than likely lead to a [MATCH listing]. The fine for March Processing from Master Card will be around $300,000.00 and if we continue to track chargebacks to the 11,000 mark (which is what PowerPay is predicting) the fine will be in excess of $650,000.00. for April.

By the end of May 2009, four separate banks had placed 16 iWorks merchant accounts on the MATCH list. Each of these accounts listed Jeremy Johnson as the principal.[10]

Credit card payments were iWorks' lifeblood. Inability to process credit card payments would be fatal to the business. On June 10, 2009, Ryan Riddle wrote an email[11] to Jeremy Johnson outlining "the proposed processing plan moving forward for Iworks.[sic]" The four page document provided specific direction to Loyd Johnston about monitoring processing to make sure "that nothing slips through the cracks" to "[give] us the best opportunity to process long term, make the most money, and keep risks to a minimum." Riddle reflected his familiarity with the need to keep chargebacks at a low level.

The Grant account that has been at Pivitol ended up last month being .04 tenths of a percent :) I think that you will also understand our reasoning for not wanting to run anything too risky (knowing it will blow) after you've read the email, as it will really affect the upsell biling [sic] and complaints.

---

[10] Exhibit 929.

[11] Exhibit 722.

The first step in the new plan was a new set of merchant accounts, "set up in iWorks name with Jeremy as the guarantor and corp president. We want this account to be obvious to Visa so they can see what we are processing."[12]

But the core of the plan included a network of corporations, each with multiple merchant accounts, in names of nominees *other than* Jeremy Johnson, using corporations established in neighboring states:

> Each of these accounts will have their own corporation and each of these corporations will have two MID's to support that coprs [sic] program. The 5 corporations are being set up in names *other* than Jeremy's (We will be using these three people.. Scott Muir, Andy Johnson, and Lacy Holm – 2 corps for Andy, 2 corps for Scott, and 1 corp for Lacy) we have 2 of these corps in progress as CA companies and the others will be set up in Nevada. We will be setting up additional corporations to be available for additional accounts/programs as they come up for Iworks Core processing needs. These "additional" corps will be set up under any of the three names previously mentioned unless Jeremy provides any new names.[13]

Many accounts were needed to carefully thread the requirements of the credit card system. So long as chargebacks did not exceed 1% of sales, and 100 per month, no fees would be assessed. And so long as fees were not charged for more than three months, the account – and its principal – would not appear on the MATCH list. Accounts had to be watched carefully to avoid fees and certainly to avoid MATCH listing. Any account in danger would be left behind and a new account used.

[12] *Id.*

[13] *Id.* (emphasis, capitalization and spelling in original).

While Harris Bank had been the principal bank processing iWorks transactions prior to June 2009, Wells Fargo Bank became the processor of most iWorks credit card transactions thereafter. Harris Bank and Wells Fargo Bank



are denominated "Merchant Acquiring Banks" in the credit card system because they hold the merchant account, enabling the merchant to process transactions. Banks may also serve as Card Issuing Banks, issuing cards to individuals who can then make purchases.

In contrast to card issuing banks which usually deal directly with the cardholder customer, Merchant Acquiring Banks use the services of Independent Sales Organizations (ISOs) who market processing accounts to merchants. iWorks began working with various ISOs in mid 2009. Commissions and fees are paid to ISO's. These amounts and the amount of reserves a bank will hold back from each transaction to cover potential losses are all subject of negotiation between the bank and ISO, and the ISO and merchant.

Just 8 days after his June 10th email, Riddle stepped up and signed a merchant account application for Diamond J Media.[14] Diamond J was previously incorporated in Nevada. Jeremy Johnson was listed as guarantor on the face page of the merchant account application.

---

[14] Exhibit 50.

5189870300038826

**Merchant Application and Agreement**

CFS1106

OFFICE:
REP: MACH 1 MERCHANTING
MID: SIC: 5999

CardFlex

2900 Bristol Street, Suite F-206
Costa Mesa, CA 92626     Sponsor Bank: Wells Fargo Bank, N.A., Walnut Creek, CA

| | |
|---|---|
| Legal Name: Diamond J Media, Inc. | Phone #: 702. 280. 3494 |
| DBA (Doing Business As): | Statement Mailing Address: 1285 Baring Blvd. Ste. 506 |
| Location/Site Address: 1285 Baring Blvd. Ste. 506 | City Sparks   State NV  Zip 89434 |
| City Sparks   State NV   Zip 89434 | Federal Tax ID Number: 26-4129699   # of Employees: 200 |
| Contact Person: Loyd Johnston   Number of Locations: 1 | Email: loyd@iworks.com |

| | | | |
|---|---|---|---|
| 1) Name (print): Ryan Riddle | | Title: Owner | Equity/Ownership: 100 % |
| Date of Birth: | Drivers License #: | State: UT | Social Security: |
| Home Address: | | City Washington | State: UT  Zip 84780 |
| 2) Name (print): Jeremy Johnson | | Title: | Equity/Ownership: % |
| Date of Birth: | Drivers License #: | State: UT | Social Security #: |
| Home Address: | | City St George | State: UT  Zip 84790 |

Johnson also signed as guarantor on the application form.

The undersigned guarantees to CardFlex Financial Services, LLC and Bank the performance of this Agreement and First Data Lease, if applicable, and any addendum thereto by Client, and in the event of default, hereby waives Notice of Default and agrees to indemnify the other parties, including payment of all sums due and owing and costs associated with enforcement of the terms thereof. CardFlex Financial Services, LLC and Bank shall not be required to first proceed against Client or enforce any other remedy before proceeding against the undersigned individual. This is a continuing guarantee and shall not be discharged or affected by the death of the undersigned and shall bind the heirs, administrators, representatives and assigns and be enforced by or for the benefit of any successor of CardFlex Financial Services, LLC and Bank. The terms of this guarantee shall be for the duration of the Merchant Processing Application and Agreement and any addendum thereto and shall guarantee all obligations which may arise or occur in connection with my activities during the term thereof, the right enforcement shall be sought subsequent to any termination.

| Guarantor X | Date: 6/18/09 | Co-Guarantor X | Date: / / |

Including Johnson on the application form turned out to be a mistake. In June 2009, a 160 page MATCH report showed Johnson, iWorks and various business names associated with iWorks as a flag on the Diamond J account.[15] Because the email address and name of Loyd Johnston as the contact person were not indexed in the credit card system, those fields did not raise MATCH alerts. June 2009 was the last month Diamond J processed sales transactions.[16]

Johnson concurred with Riddle's June 10th description of the new plan. In an email reply on June 24, 2009, he stated:

---

[15] Id.

[16] Exhibit 272 and United States' Reply to Defendant Jeremy Johnson's Preliminary Sentencing Memorandum ("Reply") at Exhibit C, docket no. 1492, filed May 20, 2016.

I am ok with this but I still want back up merchant accounts (even if we just use them a tiny bit to keep them open) and I want many different corps so all processing is broken out in many places and I want the ability to put shit processing in one of those corps not tied to us at all knowing full well it will blow up in a few months. But I am 100% with you on your plan but I want this stuff too even if we never use it. [17]

In early July 2009, Jeremy Johnson met with Andy Phillips, President and CEO of Cardflex, the ISO which opened the Diamond J Account. Mr. Johnson reported "I met with the owner of cardflex and he said they will open any account in any name or corp we want and I just sign this gurantee letter and send it with the app and they wont need allot of financial info from the corps owners." [18] The letter enclosed a separate guaranty form that did not require Johnson's name or signature to appear on the application form. This prevented "indexing" his name in the credit card system database as associated with the entities, but provided financial assurance to Cardflex.

In the view of Johnson and Riddle – and others in iWorks – this plan enabled facial compliance with the statement on each merchant account "Confirmation Page" which required the merchant to "[m]aintain fraud and chargebacks below Association thresholds" and to "[c]omply with Association rules." [19]

For iWorks and Cardflex, the motivation was money. iWorks maintained its flow of online sales, impossible without credit card processing. And Cardflex received significant commission from each transaction iWorks processed. The plan avoided fees against the merchant accounts, so long as processing and chargebacks were carefully monitored, and there was an endless supply of new merchant accounts.

---

[17] Exhibit 726.

[18] Exhibit 732 (capitalization, punctuation, spelling in original).

[19] Exhibit 680 at 35.

Jeremy Johnson was the lead in negotiations. He met with Visa representatives in September 2009.[20] He directed that accounts should be set up "so they have no idea its me and he will set up several accounts and each will have a dynamic descriptor so we can process whatever on them anytime but I want several separate accounts under different corps so they cant tie them together etc."[21] He received advice from corporate counsel that "processing for others as well as starting up various corporations . . . is . . . a federal crime and considered credit card laundering if the financial institution has not authorized such transactions."[22] He received updates on new corporations and merchant accounts and offered to find more nominees.[23]

Shortly, the first wave of new accounts became troubled as well. Eventually, these new nominees were placed on the MATCH list.[24] But new nominees were found, new corporations were formed, and eventually 281 merchant account applications were completed with Cardflex assistance.[25]

After Johnson met with Visa in September 2009, Loyd Johnston circulated an email to Riddle and others reiterating the importance of staying under the radar. "We absolutely cannot have any merchant accounts go over 1%."[26] And the program worked. Exhibits show that only $5,908.75 was assessed in fees[27] meaning that in months an account was processing sales, chargebacks on that account did not exceed 1% or 100 per month and no account was in trouble

---

[20] Exhibit 777.

[21] Exhibit 729.

[22] Exhibit 915.

[23] Exhibit 803.

[24] Exhibit 930.

[25] Exhibit 928.

[26] Exhibit 777.

[27] Exhibits 605-607. Those exhibits are for MasterCard accounts. Exhibits 608-628 show no fees assessed on Visa accounts. The chargebacks are summarized in Reply, Exhibit C and discussed in Reply at 27-34.

through three months of monitoring. However, because closed accounts continued to receive chargebacks, the accounts in incurred 29,842 chargebacks on 745,860 sales for a chargeback rate of 4.00%, far above the acceptable 1%.

The applications for the accounts of conviction are listed below:

| Count | Entity | DBA | Nominal Owner | Application Date | Application Exhibit No. |
|---|---|---|---|---|---|
| 2 | GGL Rewards | Placing Ads Now | S.M. | 07/09/2009 | 103 |
| 3 | GGL Rewards | ClickMoneyShop.com | S.M. | 07/09/2009 | 102 |
| 5 | GGL Rewards | Advertising 4 Money | S.M. | 07/09/2009 | 101 |
| 4 | GGL Rewards | Ads 4 Profits | S.M. | 07/09/2009 | 100 |
| 6 | Business Loan Success | Alternative Funding | S.M. | 07/15/2009 | 44 |
| 7 | Business Loan Success | My Alternative Funds | S.M. | 08/18/2009 | 45 |
| 8 | Net Business Success | Be a Rebate Millionaire | M.J. | 02/03/2010 | 112 |
| 9 | Balance Processing | Web Search Profit By Clicking | T.J. | 03/05/2010 | 2 |

## OTHER BACKGROUND

### Convictions

On March 25, 2016, a jury found Mr. Johnson guilty of Counts 2 through 9 of the Indictment. These counts are violations of 18 U.S.C. § 1014, making false statements to a bank. Violations of this statute may result in a maximum penalty of up to 30 years imprisonment and a $1,000,000.00 fine.

### Offense Level in Presentence Report

The Presentence Report (with which the Mr. Johnson and the prosecution disagree) concludes the following factors arrive at an offense level of 31 for Mr. Johnson:

### PSR Sentencing Guidelines Calculation
Base Offense Level under § 2B1.1      7
Specific Offense Characteristics under      +14

§ 2B1.1(b)(1)(H) (More than $550,000 in loss)

| | |
|---|---|
| Sophisticated Means under § 2B1.1(b)(10)(C) | +2 |
| Gross Receipts from financial institution in excess of $1,000,000 under § 2B1.1(b)(16)(A) | +2 |
| Leader/Organizer under 3B1.1(a) | +4 |
| Obstruction of Justice | +2 |
| **Total Offense Level** | 31 |

### Criminal History.

The parties agree Mr. Johnson's Criminal History Category is I because he has no prior convictions.

### Base Offense Level.

The parties do not dispute the base offense level of 7 set in §2B1.1(a).

## DECISIONS ON DISPUTED ISSUES

### Right to Jury Trial; Due Process

Johnson argues that consideration of acquitted or uncharged offenses by a judge making guideline calculations violates the Fifth and Sixth Amendments.[28] Johnson makes this argument with regard to loss calculations, and consideration of relevant conduct, but it might apply to other enhancements as well. But Johnson cites only case law about the right to jury trial if a statutory maximum or mandatory minimum is at issue, and cites no binding precedent and makes no persuasive argument. The Tenth Circuit does not believe judge fact-finding in sentencing is wrong, so long as the statutory maximum is not exceeded.[29] And Mr. Johnson made no request at trial to have any facts relevant to enhancement found by the jury. Therefore, this order finds facts.

---

[28] Position of Defendant Jeremy Johnson with Respect to Sentencing Factors ("Johnson Position") at 25-30, docket no. 1597, filed July 22, 2016.

[29] *United States v. O'Flanagan*, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert error under *Apprendi* because "his sentence does not exceed the statutory maximum"); *United States v. Fredette*, 315 F.3d 1235, 1245 (10th Cir. 2003) ("*Apprendi* does not apply to sentencing factors that increase a defendant's guideline range but do not increase the statutory maximum.").

**Sophisticated Means**

Under § 2B1.1(b)(10)(C) if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12." The Guideline Application Note 9(B) provides a definition.

> (B) Sophisticated Means Enhancement under Subsection (b)(10)(C).—For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Mr. Johnson claims that this case is comparable to a charge of filing a fraudulent tax return based on false statement of withheld income, or "establishing a post office box under an assumed name for the purpose of mailing fake letters and testimonials." The sophisticated means enhancement did not apply in those cases.

But something as simple as multi-state location may constitute "sophisticated means." That was present in this case. As an example, Exhibit 103, the account application subject of Count 2, shows a Nevada corporation with a business address in Las Vegas, Nevada; the nominee owner's address in Alpine, Utah; and a bank account in St. George, Utah.

Evidence was clear that the use of the corporate form, nominee owner, maildrop addresses, and single purpose bank accounts was all designed to allow iWorks to process credit card transactions without detection by the card system. Detailed planning documents such as Exhibit 693, 722, 752, 777, 783, 785, 786, 791, 794, 796, 823, 829, and 832 establish that

merchant account establishment was a well-planned and highly coordinated activity. The flowchart in Exhibit 693, prepared by his staff, shows the complexity of merchant account setup.

Establishment of each merchant account required a nominee owner, a corporate entity, an out-of-state address using a maildrop service, an agreement to forward mail from the fictitious addresses to iWorks' address in St. George, out-of-state telephone service with a prefix number corresponding to the state of incorporation, designation of employee population on the applications, a depository bank account in the nominee's name with Scott Leavitt's signatory authority to enable fund transfer, transfer of funds from the nominee depository accounts directly to iWorks and Johnson bank accounts, a tax identification number, and tax returns in the name of the nominee owners and corporations. In many instances fictitious documents indicated the purchase and sale of corporations from one nominee owner to another, when neither owner ever exchanged property, paid or received money in the transaction. The merchant account applications, bank account documents, tax returns, bank records, and merchant account records related to Counts 2 – 9 show these features.

These facts clearly fit the application note statement that sophisticated means includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ."

These actions were intentional on Johnson's part based on facts stated in the next section.

**Leader or Organizer**

Under § 3B1.1(a) the offense level for a defendant may be increased four levels if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ." There is no dispute that Johnson was

President[30] and sole owner of iWorks. He was the one who met with Andy Phillips and arranged to meet with Visa.



The email record establishes he was the one who made final decisions and that Ryan Riddle, Scott Leavitt, Bryce Payne, and Loyd Johnston, among others, directed reports and requests for decisions to him. This establishes the requirement of five participants. In addition, the elaborate organization of activities set forth in Exhibits 722, 752, 777, 783, 785, 786, 791, 794, 796, 823, 829, and 832 show the extensive geographical reach of the many interrelationships of the activity. The amount of money processed by the merchant accounts also establishes that the activity was extensive.

He was also the beneficiary of much of the money generated by the company.[31] At least $1,125,000 was used to pay his personal taxes.[32] No other person received a similar benefit. This enhancement provides a four level increase.

---

[30] Exhibit 834.

[31] Exhibit 935.

[32] *Id.*

**Gross Receipts from financial institution in excess of $1,000,000**

Under § 2B1.1(b)(16)(A) if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense [the offense level will] increase by 2 levels . . . ." Application Note 12 provides further guidance:

> 12. Gross Receipts Enhancement under Subsection (b)(16)(A).—
> (A) In General.—For purposes of subsection (b)(16)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000.
> (B) Definition.—"Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. See 18 U.S.C. § 982(a)(4).

**Derived From.** Johnson objects that the money at issue was not derived "from a financial institution." He relies on *United States v. Stinson*[33] in which two independent financial advisory firms used the Stinson's fictitious marketing materials to solicit numerous investors, who collectively invested millions of dollars in the fund. The clients made individual decisions to invest on the advice of their investment advisors at each firm. The Third Circuit remanded because the record before it was insufficient to determine if the enhancement applied, even though it appeared the financial institutions were not the source of the funds. The court gave guidance.

> We thus hold that [the gross receipts enhancement] will apply when the evidence shows that a financial institution, not an individual, was the source of the $1 million in gross receipts. A financial institution is a source of a defendant's gross receipts if it owns the funds. Hence, a financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds. A financial institution is not the source of all funds that have passed through the institution, as might occur during a simple wire transfer.[34]

---

[33] 734 F.3d 180 (3rd Cir. 2013)

[34] *Id*. at 186.

*Stinson* tells us that in a wire transfer, a bank has no ownership interest. The bank is a conduit, with no personal interest in the funds. But the testimony at trial about the credit card processing system indicated that the bank does have an interest in the transactions.

Referring to the chart reproduced earlier in this document at page 6, Ofer Yitzahki of Wells Fargo Bank testified about the flow of funds.

> Q. So referring now back to our chart here, how does this work? How do funds get to the merchant?
> A. So this is credit card 101. And you may have heard this before. I'm not sure. But if we make a purchase with our credit cards, the way that the merchants are getting paid is that our issuing bank, the bank that issued our credit cards, would ding our [cardholder] account, take money out of it and move it -- take it to the card brands, bring it to Visa and MasterCard, and then Visa and MasterCard would send it to us, the acquiring bank, in our case Wells Fargo NA. We then . . . make the underlying merchant whole. So we pay the Joe Garages of the world and the Susie Socks of the world directly.[35]

Not only do the banks have accounts through which the funds are moved, the banks are financially responsible when things go wrong. The money is not just flowing through the bank's facilities as with a wire transfer, the bank has financial obligations as it manages this money. As Martin Elliott of Visa testified:

> [S]ince the acquiring banks are financially responsible for these merchants, they want to understand whether or not the individuals have been financially responsible themselves. Ultimately, any of the sales that the merchant processes may be subject to dispute through a chargeback process, and so, for example, if a merchant submits thousands of fraud transactions through the payment system, they may be reversed 30, 40, 60 days later, and if there aren't funds in the merchant's account to cover those reversed fraud transactions, the bank would absorb and eat those transactions and take a financial loss.[36]

**Double Counting.** Johnson objects that use of this enhancement would be double counting. "Impermissible double counting occurs 'when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which

---

[35] Trial Tr. 823:18-824:6, [docket no. 1532](), filed June 15, 2016.

[36] Trial Tr. vol. I, 104:3-13, [docket no. 1540](), filed June 15, 16.

necessarily overlap, are indistinct, and serve identical purposes.'[37] The case relied on by Johnson held "a sentencing court cannot enhance a defendant's sentence for a robbery under the Guidelines by reason of his use of a firearm if the defendant has been separately convicted and is being sentenced under § 924(c) for using the firearm in the commission of the same robbery."[38] The gross receipts enhancement is not based on facts which form the basis of another offense of conviction. Johnson acknowledges that the Tenth Circuit has "reject[ed] the contention that the application of the sophisticated means enhancement in tandem with the amount of loss and gross receipts enhancements constituted double counting."[39] This enhancement is based on *where* the money was obtained, and is not a stand-alone measure of gravity of the offense.

**Causation**. Causation exists. While *United States v. Sandlin*[40] was decided on a record devoid of evidence of reliance on the misrepresentation, the iWorks emails themselves show the necessity of concealment of Johnson's involvement, and of iWorks use of the entities. "Loyd lets set up accounts in chads system with Litle but have him do it so they have no idea its me."[41] "[W]e are looking to create a new corporation. Jeremy does not want his name associated with a [MATCH]."[42] "This will only work if the acquiring bank doesn't recognize iWorks (this is only an issue if they recognize iWorks and then want to look into Jeremy and then see the [MATCH]."[43]

---

[37] Johnson Position at 45, citing and quoting *United States v. Blake*, 59 F.3d 138, 140 (10th Cir. 1995).

[38] *Blake*, 59 F.3d at 139-40.

[39] *United States v. Small*, 210 F. App'x 776, 783 (10th Cir. 2006).

[40] 589 F.3d 749, 756-57 (5th Cir. 2009).

[41] Exhibit 729.

[42] Exhibit 707.

[43] Exhibit 705.

As noted earlier, Johnson was the beneficiary of the money generated by the company.[44] At least $1,125,000 was used to pay his personal taxes.[45] All the funds from iWorks, a subchapter S corporation, passed through to his personal return.[46] This meets the enhancement threshold. This enhancement provides a two level increase but may have an effect on the overall offense level due to 2B1.1(b)(16)(D).

**Obstruction of Justice**

The sentencing guidelines provide for a 2 level enhancement:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .[47]

Application Note 3 recognizes that "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness" and "is not subject to precise definition . . . ." Therefore, two Application Notes give examples of conduct to which the adjustment applies (Note 4) and does not apply (Note 5). "[C]omparison of the examples . . . should assist the court in determining whether application of this adjustment is warranted in a particular case." Note 3 also advises that "less serious forms of conduct to which this enhancement is not intended to apply "can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guideline range."

---

[44] Exhibit 935.

[45] *Id.*

[46] Johnson marked his 2008 and 2009 personal and iWorks tax returns as Exhibits 1952-1955, showing that all iWorks income from 2008 and 2009 passed through to him.

[47] U.S.S.G. §3C1.1.

The prosecution in early briefing detailed six instances[48] it said qualified Johnson for this enhancement, and in its most recent filing identified 13 instances, which included the original six, all supported by evidence in the record,[49]

[48] Sentencing Memorandum Discussing Relevant Guideline Applications at 28-29, docket no. 1461, filed April 22, 2016.

[49] Prior the Court's issuance of an order under DUCrimR 57-6, Johnson was publishing numerous websites, blogs, and videos defaming the prosecutors and investigators in this case. He even created a false Facebook page for the United States Attorney's Office for the District of Utah and used unauthorized images of then-U.S. Attorney David Barlow.

While on pre-trial release and after representing to the Court that he lacked funds to pay for counsel, Johnson made numerous gambling trips to high-end Las Vegas casinos where he gambled away substantial sums of money playing poker and slot machines.

While on pre-trial release Johnson schemed to purchase property from the receiver in the FTC Case through a nominee.

While on pre-trial release Johnson schemed with Terrason Spinks to violate the Preliminary Injunction Order in the civil case in an attempt to get shares of stock released to Spinks.

Prior to the plea hearing in January 2013, Johnson schemed with the then Utah Attorney General about how to scuttle the plea in open court, showing that he never intended to plead guilty but just wanted to make a public show.

Johnson has lied to the District of Nevada and this Court about the nature of silver held by the receiver in attempts to get it released from the receivership.

Prior to trial Johnson stalked the U.S Attorney's Office and attempted to gain after-hours entrance to the office.

During trial, Johnson called various Wells Fargo Bank branches for the purpose of manufacturing evidence. As set forth in previous papers, Johnson lied in every call to Wells Fargo representatives243 and referred to his trial as "this fucking stupid trial." This statement perfectly summarizes Johnson's view of his obligations to obey the law.

During trial, Johnson provided Mr. Marcus Mumford a manufactured document claiming that it showed Wells Fargo approved a merchant account in the name of iWorks and Jeremy Johnson in 2016. Mr. Mumford then attempted to admit this document at trial. Johnson did not disclose the truth until the United States and Wells Fargo discovered that the real merchant account application was in the name of a nominee and that Wells Fargo had immediately terminated the account after it got through a preliminary round of underwriting.

During trial, Johnson had direct communications (verbal and text) with a sworn witness who was represented by counsel in an attempt to influence her testimony and manufacture evidence to support a mistrial motion.247 Johnson also had his close associate Karen Beck (who attended many days of trial) call the witness.

During trial, Johnson improperly excused a witness in violation of the Court's instructions.

Johnson caused at least one government witness secretly to record a witness preparation session with government prosecutors, obtained the recording, selectively edited the recording, and publicly filed it with his motion to dismiss claiming without basis misconduct on the part of the prosecution.

Following trial, Johnson appears to have orchestrated from jail the effort to contact three jurors and obtain affidavits in violation of the Court's Order. The Court has stayed ruling on whether to hold a show cause hearing regarding this contact until conclusion of the sentencing proceedings.

While very troubling to the Nevada Receivership, his numerous attempts to evade the restrictive orders in that case are not relevant here. His penchant for secret recordings and encouragement of others to do the same is demeaning to those whom he later uses the recordings against, but is not an obstruction of justice. All these actions were willful but no one of them is in the category of severity to merit the enhancement.

But careful review of the listed instances shows that several rise to the level of gravity of the examples in Application Note 4. Excusing Loyd Johnston from scheduled appearance was a serious interference with the jury's schedule. Jeremy Johnson's text message and voice contacts of a witness who was under oath and represented by counsel, while he was under an order not to have witness contact without consent of counsel, was a significant breach of the court's rules.[50] His excessive attempts to generate pretrial publicity and interfere with the reputation and office premises of the U.S. Attorney's Office were outside the bounds of proper conduct. His attempts to generate irrelevant evidence reflect his lack of respect for the legal system. Seeking guidance from the then Utah Attorney General to sabotage a plea arrangement is a significant obstruction. The aggregate of these actions in this case merit the enhancement. Johnson is aggressive, self-directed, and intent on subverting rules and systems and demonstrated that in the course of the case.

### Johnson Will Not Be Rewarded for Assistance

In spite of the fact that there is no "motion of the government" for a departure under Guidelines § 5K1.1, and without authority for invoking the provision without such a motion, Johnson still argues that his sentence should be mitigated because he presents a statement from

---

United States' Sentencing Memorandum Regarding Jeremy Johnson at 54-56, docket no. 1594, filed July 22 2016.
[50] Exhibit 947.

Troy S. Rawlings, Davis County Attorney. Rawlings states that "Mr. Jeremy Johnson, probably to the consternation of the United States Department of Justice, has provided and will continue to provide substantial assistance in the attempted prosecutions of former Utah Attorneys General Mark L. Shurtleff and John Swallow." On its face, this claim for credit due to *conflict* with the federal prosecuting authority is without merit.

## CONCLUSION

The important decision about application of the specific offense characteristic for loss under § 2B1.1(b)(1)(G) remains. However, the following components of his offense level are decided.

| | |
|---|---|
| Base Offense Level under § 2B1.1 | 7 |
| Sophisticated Means under § 2B1.1(b)(10)(C) | +2 |
| Gross Receipts from financial institution in excess of $1,000,000 under § 2B1.1(b)(16)(A) | +2[51] |
| Leader/Organizer under 3B1.1(a) | +4 |
| Obstruction of Justice | +2 |

Dated July 28, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[51] Subject to possible additional adjustment under § 2B1.1(b)(16)(D).